# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL BARTOLOTTA, individually and on behalf of all others similarly situated, | ) ) ) | |
| *Plaintiff,* | ) ) | Case No: 16 CV 4137 |
| v. | ) ) | Judge Thomas M. Durkin |
| DUNKIN' BRANDS GROUP, INC., a Massachusetts corporation, and ORLAND PARK DONUTS, INC., d/b/a DUNKIN' DONUTS STORE #339462, an Illinois corporation, | ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Bartolotta has brought a class action against Dunkin' Brands Group, Inc. ("the Corporate Defendant") and Orland Park Donuts, Inc. ("the Store") alleging that Defendants charged an excessive amount of sales tax on his purchase of bulk coffee beans. Both the Corporate Defendant and the Store have filed motions to dismiss, and, alternatively, motions for summary judgment. Oral argument was heard on September 12, 2016. The Court has reviewed the briefs filed by the parties and considered the arguments made at the oral argument. For the reasons set forth below, both Defendants' motions to dismiss are granted. Defendants' alternative motions for summary judgment are dismissed as moot.

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g.,* *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th

Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## BACKGROUND

The State of Illinois taxes commercial food sales under the Retailers' Occupation Tax Act ("ROTA"), 35 ILCS 120/2-10 (tax imposed on retailer based on "gross receipts from sales of tangible personal property made in the course of business"), and the corresponding Use Tax Act ("UTA"), 35 ILCS 105/3-10 (tax imposed on consumer based on selling price of tangible property purchased at

retail).[1] In relevant part, both statutes provide that the rate of the tax is 6.25% ("the high tax rate"), unless the sale is for food "that is to be consumed off the premises where it is sold (other than alcoholic beverages, soft drinks, and food that has been prepared for immediate consumption)," in which case "the tax is imposed at the rate of 1%" ("the low tax rate").[2] Plaintiff alleges that in March 2016 he purchased coffee beans from the Store and that he was charged the high tax rate on that purchase, notwithstanding that the plain language of the ROTA and the UTA provides that the low tax rate should have applied because coffee beans, by their very nature, must be consumed off-premises. Plaintiff alleges that the Store knowingly overcharged him the high tax rate, causing him actual damages in the amount of the overcharges. Plaintiff seeks recovery on behalf of himself and a class of plaintiffs for monetary losses from the tax overcharges, as well as injunctive relief, attorneys' fees, and costs.

---

[1] In *Karpowicz v. Papa Murphy's International, LLC*, 2016 WL 3609106 (Ill. App. 5th Dist. July 5, 2016) (unpublished), the court explained how these complementary taxing schemes work:

> The Retailers' Occupation Tax Act imposes a tax on the occupation of selling tangible personal property for use or consumption in Illinois. The tax is computed as a percentage of the retailers' gross receipts and is remitted to the Illinois Department of Revenue (IDOR). The Illinois Use Tax Act imposes a tax upon a privilege of using tangible personal property purchased at retail from a retailer. The Use Tax Act requires Illinois retailers to collect the tax from customers; the retailer must then remit the tax to the IDOR.

*Id.* at *2 n.3 (citations omitted).

[2] Local taxes may increase these base tax rates.

**DISCUSSION**

## A.   THE CORPORATE DEFENDANT

As an initial matter, the Court will address the Corporate Defendant's argument that, apart from the merits issues regarding Plaintiff's underlying claims, it is not a proper defendant in this case. The Store, not the Corporate Defendant, is the party who allegedly sold the coffee beans to Plaintiff and over-charged him for the taxes on the sale. Moreover, the Corporate Defendant contends (and Plaintiff does not dispute) that the Store is a privately owned and independently operated franchise of the Dunkin' Donuts franchise system.[3] Plaintiff seeks to hold the Corporate Defendant liable for the Store's allegedly improper tax overcharges based on the allegation that the Corporate Defendant "directs" or "controls" the Store's collection of state taxes.[4] The Corporate Defendant argues that Plaintiff's allegations of control are conclusory and do not survive the plausibility standard of *Twombly* and *Iqbal*. Plaintiff counters that he has alleged that not only the Store but numerous other independently owned Dunkin' Donuts franchises are charging the higher tax rate on bulk coffee sales, while virtually all of their competitors are

---

[3] *See http://www.bluemaumau.org/sites/default/files/DD_FDD%208.pdf* (at page 7) (Franchise Disclosure Statement) ("At the end of our last fiscal year, on December 29, 2007, there were 5,863 franchised Dunkin' Donuts stores operating in the United States and an additional 2,219 Dunkin' Donuts stores operating in 30 other countries, but no company-owned Dunkin' Donuts stores.").

[4] *See* R. 1, ¶ 14 (alleging that the Store Defendant "is subject to detailed control by [the Corporate Defendant] including the fees and charges imposed on customer purchases of Dunkin' Donuts branded goods"); *id.* ¶ 27 (alleging that the Corporate Defendant "directs its locations to charge the 'high rate' on bags of coffee beans and grounds"); *id.,* ¶ 28 (alleging that the Corporate Defendant "controls the prices and taxes . . . . through programs in the point-of sale system").

charging a low rate. *See* R. 1 at 8 (¶¶ 52-58). Plaintiff argues that these facts suggest that the Corporate Defendant played a role in the Store's decision to charge the higher rate.[5]

The majority rule is that a franchisor can be held vicariously liable for the torts or other wrongdoing of a franchisee when "the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff." *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 990 N.E.2d 1054, 1064 (Mass. 2013) (citing case law); *see, e.g., Courtland v. GCEP-Surprise, LLC*, 2013 WL 3894981, at *6 (D. Ariz. July 29, 2013) (no franchisor liability where "[f]ranchisor supervision does not extend [ ] to control over an instrumentality of franchisee harm"); *People v. JTH Tax, Inc.*, 151 Cal. Rptr. 3d 728, 747-48 (Cal. App. 2013) (franchisor can be found liable for misleading advertising and unfair business practices of its franchisee "under normal agency theory"). A franchisor also can be held liable when it participated in the alleged wrongs. *See State v. Cottman Transmissions Sys., Inc.*, 587 A.2d 1190, 1196 (Md. Ct. Spec. App. 1991) (holding that even where the facts do not support a finding of an agency relationship between the franchisor and franchisee, the "franchisor equally commits a deceptive practice" when it "directs [the] deceptive practices by using its economic and contractual clout to force its franchisees to commit deception"). Illinois law appears to be consistent with these principles. *See, e.g., Slates v. Int'l House of Pancakes, Inc.*, 413 N.E.2d 457, 464 (Ill.

---

[5] *See* R. 39 at 11 ("It would be an unlikely coincidence that all twenty-four Dunkin' Donuts franchisees that have been identified thus far each made the independent decision to charge the high rate, when all of their competitors reached the opposite conclusion.").

App. 4th Dist. 1980) (while the "[t]he mere licensing of a trade name does not create an agency relationship, either ostensible or actual," nonetheless, "[w]here a sufficient degree of control and direction is manifested by the parent franchisor, an agency relationship may be created").

There are literally thousands of Dunkin' Donuts franchises privately owned around the world, and the Corporate Defendant makes a compelling argument that it should not be subject to liability every time one of those franchisees gets sued. *See Depianti v. Jan-Pro Franchising Int'l, Inc.*, 39 F. Supp. 3d 112, 131 (D. Mass. 2014) ("JPI is not vicariously liable for the conduct of its regional master franchises . . . merely because of the general degree of influence inherent in a typical franchisor-franchisee relationship."); *Patterson v. Domino's Pizza, LLC,* 333 P.3d at 723, 726 (Cal. 2014) ("The imposition and enforcement of a uniform marketing and operational plan cannot automatically saddle the franchisor with responsibility for employees of the franchisee who injure each other on the job."); *Cottman Transmissions Sys., Inc.*, 587 A.2d at 1198 n.13 (expressing reluctance to impose liability on a franchisor for unfair or deceptive trade practices committed by a franchisee "completely independent of any coercion or actions of the franchisor" because the imposition of such liability would constitute "a vast [ ] judicial expansion of the scope of the [unfair trade practices statute's] provisions"). But just as the existence of a franchise agreement does not automatically trigger liability on the franchisor's part, neither does it insulate the franchisor from such liability. *Drexel v. Union Prescription Ctrs., Inc.,* 582 F.2d 781, 786 (3d Cir. 1978).

The Court concludes that Plaintiff has alleged control over the specific policy or practice of the Store that allegedly caused Plaintiff's harm. Further, while Plaintiff alleges control in mostly conclusory terms, those allegations are rendered plausible by the complaint's additional allegations concerning uniformity in the manner in which Dunkin' Donuts franchises have interpreted and applied the tax law at issue,[6] versus their competitors who for the most part allegedly apply the low tax rate to the sale of bulk coffee beans.[7] The Court is not making any legal determinations regarding the exact circumstances required for the Corporate Defendant to be held liable under Illinois law for the Store's conduct, as that issue has not been explored or developed by the parties in the current briefing. Rather, in declining to rule in the Corporate Defendant's favor on this issue, the Court is merely noting that the law may impose liability under some circumstances relative to the control issue, and that the conclusory control allegations Plaintiff makes in the complaint are supported by a reasonable inference drawn from the additional

[6] Regarding Plaintiff's factual allegations on this point, the Court does not think it is dispositive that the newspaper articles cited in the complaint, purportedly discussing instances in which Dunkin' Donuts stores in other states were accused of overcharging on sales tax, also report comments by the persons involved indicating that the Corporate Defendant was not responsible for its franchisees' collection of the taxes in question. The Court bases its finding of plausibility on the factual allegation that numerous other Dunkin' Donuts franchisees also have charged the higher tax rate, not on the comments and reports in these articles.

[7] To the extent that Plaintiff supplements the factual allegations of the complaint on this point with materials submitted with its opposition brief, the Court disagrees with the Corporate Defendant's argument (R. 44 at 3 n.2) that the Court may not consider those additional materials on a motion to dismiss. A party opposing a motion to dismiss may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings. *See Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

allegations regarding uniformity among Dunkin' Donuts franchisees. *See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 408-10 (S.D.N.Y. 2013) (discussing types of allegations that would be needed to plausibly allege a factual basis for a control theory of liability). Additional factual support for Plaintiff's control allegations is likely to be in the exclusive possession of Defendants, and it therefore would be unreasonable to require Plaintiff to provide further factual evidence of such control at the pleading stage when he has not yet had the opportunity to discover those facts.[8]

---

[8] Given the Court's ultimate disposition of this case on the merits as set forth in the next section, the discovery point is largely academic. Nevertheless, the Court acknowledges the Corporate Defendant's concern (hypothetical in this case) of having "to spend hundreds of thousands of dollars in discovery to establish the falsity of Plaintiff's" allegations of control. R.30 at 9 n.4. The better way to address this concern, however, is not to impose an inappropriately high pleading burden on Plaintiff but to place appropriate restrictions on discovery. The Court further notes that even if the Corporate Defendant were to be dismissed but the case move forward against only the Store, Plaintiff could still obtain third party discovery from the Corporate Defendant, and, if that discovery were to show that the Corporate Defendant did have some involvement in the taxing decision at issue here, Plaintiff would likely be allowed to amend his complaint to add the Corporate Defendant back in as a defendant in the case. Again, this is all hypothetical as the Court ultimate dismisses Plaintiff's claims for failure to plead an adequate legal theory that he is entitled to relief. But in the unlikely event that Plaintiff is able to successfully replead his claims, it would make more sense to allow the case to proceed against both defendants and address the legal issue of control by the Corporate Defendant, as it is addressed in most of the case law dealing with that issue, on a fully developed factual record at the summary judgment stage. *See, e.g., O'Banner v. McDonald's Corp.*, 653 N.E.2d 1267, 1270 (Ill. App. 1995) (holding on summary judgment that "the affidavits and supporting documents contained in the record establish that McDonald's Corporation was not the owner or operator of the subject restaurant," and that "[t]he operator's lease, the license agreement and the franchise agreement for the restaurant which were in place at the time of plaintiff's accident clearly and undisputedly establish the lack of an actual agency relationship between McDonald's and its franchisee"), *rev'd on other grounds*, 670 N.E.2d 632 (Ill. 1996); *Depianti,* 39 F. Supp. 3d at 137 (holding on summary

In the alternative to arguing that Plaintiff's allegations of control lack plausibility, the Corporate Defendant also argues that the Court can take notice of the franchise agreement, which agreement, the Corporate Defendant contends, proves that it does not have control over the Store's decision to charge the higher tax rate. One problem with this argument is that the franchise agreement between the Corporate Defendant and the Store is outside of the complaint and thus not part of the current record before the Court. Moreover, while the Corporate Defendant argues the Court can take judicial notice of the franchise agreement because it is a public record, in fact the only public document to which the Corporate Defendant refers is a copy of a sample franchise agreement found on a website apparently operated by an organization that promotes services and interests of franchisees and potential franchisees.[9] But the sample franchise agreement found on that website is not the actual franchise agreement between the Corporate Defendant and the Store, and no party has produced any evidence from which the Court can conclude that the pages from the sample document referenced by the Corporate Defendant in its brief are identical to the actual agreement between the Corporate Defendant and the

judgment that no reasonable fact finder could conclude that the franchisor controlled, or had a right to control, the specific policies and practices relevant to the plaintiff's claim that the franchisee committed an unfair or deceptive business practice); *Patterson,* 333 P.3d at 741 (holding on summary judgment that franchisor not liable for sexual harassment of employee of franchisee).

[9] The website in question provides free access to the disclosure documents and sample franchise agreements of various national franchises, including Dunkin' Donuts. *See http://www.bluemaumau.org/sites/default/files/DD_FDD%208.pdf.* Presumably, since the Corporate Defendant is the party who referred the Court to this website, it does not contest the authenticity of the documents made available on it.

Store.[10] Nor has the Corporate Defendant established that all terms material to the control issue have been disclosed to the Court through the one or two pages from the sample franchise agreement to which the Corporate Defendant cites. Plaintiff generally denies the Corporate Defendant's assertion that the actual franchise agreement is publicly available, but admits that he now has possession of it through discovery in this case. Nevertheless, since neither party has submitted the agreement to the Court for review in connection with the pending motions to dismiss, the Court does not believe it is proper to base its decision on that document.

Moreover, if the Court were to consider the sample franchise agreement (and assume it is identical to the actual franchise agreement between the Store and the Corporate Defendant), that agreement, while supportive of the Corporate Defendant's argument that it does not control the Store's actions regarding the collection of taxes, does not definitively resolve the control issue. The Corporate Defendant cites to Section 7.1, which states that the franchisee has a contractual duty to comply with all local laws, including tax laws. *See http://www.*

---

[10] The Corporate Defendant also asserts that the franchise agreement is "publicly available" by "contacting the state examiner." R. 44 at 3 n.3. The Corporate Defendant then provides a web address (*http://www.illinoisattorneygeneral.gov/ consumers/franchise_forms.html*). But as far as the Court can tell, that web address only contains sample forms, not the actual agreement between the Corporate Defendant and the Store. Whether a copy of the actual agreement may be obtained through the state governmental body with authority over franchises is not clear. But even if it could be, the Corporate Defendant has neither provided a copy to the Court nor made any argument that the requirements for taking judicial notice have been satisfied by referencing a document that could be, but has not been, obtained from the state.

Bluemaumau.org/ sites/default/files/DD_ FDD%208.pdf (at page 260). A contractual duty to comply with the tax laws, however, does not necessarily negate the possibility that the franchisor can dictate what the Store should do in order to comply. The Corporate Defendant also cites to Section 7.3 of the agreement, which states that the franchisee has the discretion to determine the prices it charges for products it sells. *Id.* But the "price" may not include the taxes, and, even if it did, the provision is qualified with the language "[e]xcept as [the Franchisor] may be permitted by law to require a particular price."[11]

In any event, even if the terms of the franchise agreement clearly provided that the Corporate Defendant did not have contractual control over the Store's determination of what tax to collect, that would not be the end of the matter. "'Whether the relationship between a franchisor and a franchisee is that of principal and agent, at least insofar as this relationship affects a stranger to the franchise agreement, is dependent upon the intention of the parties as determined from the written agreement *and the accompanying circumstances.*'" *Salisbury v. Chapman*

---

[11] A state court in New Jersey has reached the opposite conclusion regarding these provisions after considering what appears to be the Corporate Defendant's franchise agreement with a different franchisee, holding that the terms of the franchise agreement make clear that the Corporate Defendant did not have control over the franchisee's collection of state taxes. *See Frate v. Dunkin' Brands Inc.,* 2016 WL 3542402 (N.J. Super. Ct. June 28, 2016). In that case, unlike here, the franchise agreement was referenced in the complaint, and the court therefore could consider it on a motion to dismiss. In addition, there is no indication in the New Jersey court's opinion either that the court considered the legal principles discussed above regarding the circumstances under which a franchisor can be held liable for the conduct of a franchisee, or that the complaint contained the additional allegations made here regarding uniformity of tax treatment among franchisees. These legal principles and additional factual allegations are what push Plaintiff's allegation of control in this case from the realm of possible into the realm of plausible.

*Realty*, 465 N.E.2d 127, 131 (Ill. App. 3rd Dist. 1984) (quoting *Slates,* 413 N.E.2d at 464) (emphasis added). The question, therefore, is not just whether the Corporate Defendant had the right to control under the franchise agreement, but whether it in fact did control the Store in connection with the Store's conduct challenged in the complaint. *See Dipianti*, 990 N.E.2d at 1064 n.11 ("Jan-Pro's vicarious liability would then turn on whether Jan-Pro controlled or had a right to control Bradley in connection with such representations and conduct."). In short, while the nature and extent of control as defined in the franchise agreement is relevant, so too is the parties' actual conduct and practice. *See Drexel*, 582 F.2d at 786 ("The fact that the franchise agreement expressly denies the existence of an agency relationship is not in itself determinative of the matter."); *Patterson,* 333 P.3d at 741 ("Of course, the parties' characterization of their relationship in the franchise contract is not dispositive."). In light of the potential relevancy of facts beyond or in addition to the terms of the franchise agreement, the Court declines to dismiss the Corporate Defendant on this basis, even if the terms of the franchise agreement are taken into account and interpreted in the manner in which the Corporate Defendant argues they should be interpreted.

### B. THE STORE

Plaintiff alleges two causes of action: (1) a claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), and (2) negligent misrepresentation.

### 1.    ICFA

"To prevail under the ICFA, a party must ultimately show (1) an unfair or deceptive act or practice by defendant, (2) defendant's intent that plaintiff rely on or be treated unfairly by the act or practice, and (3) that the deception occurred in the course of conduct involving trade and commerce." *R. Rudnick & Co. v. G.F. Protection, Inc.*, 2009 WL 112380, at *1 (N.D. Ill. Jan. 15, 2009). Citing to *People v. Stianos*, 475 N.E.2d 1024 (Ill. App. 2d Dist. 1985), Plaintiff contends that a retailer's practice of overcharging for sales tax constitutes both a deceptive and an unfair trade practice within the meaning of the ICFA. The Store contends that it did not overcharge Plaintiff for sales tax, and that, even if it did, its mistake was an honest one that cannot form the basis of an unfair or deceptive trade practices claim.

The Store sells both food consumed on-premises and food intended to be consumed off-premises such as the pre-packaged coffee beans at issue here. Pursuant to regulation issued by the IDOR, which rate under the Illinois tax scheme should be applied to the Store's sales of coffee beans depends on several factors. Moreover, both Plaintiff and Defendants have presented reasonable arguments in support of their conflicting interpretations of the applicable regulation. But the Court concludes that the better of the arguments is for the high tax rate to be applied.

The statute states that the tax rate applicable to food to be consumed off-premises is 1%. The bulk coffee beans fall within the category of foods to which the

low rate would seem to apply because, by its nature, it is intended to be consumed off-premises. However, the IDOR regulation establishes a rebuttable presumption for a retailer that has seating or other facilities for on-premise consumption of food. The presumption is that the high tax rate applies for *all* food sales by that retailer. The regulation expressly states that, "[a]s a result of this presumption, even bulk food could potentially be taxable at the high rate." 86 Ill. Admin. Code, Section 130.310(b)(1). The retailer may challenge the presumption that the high tax rate applies by proving that it can satisfy a two-part test set out in the regulations. The Store contends that it never challenged the presumption because it cannot satisfy the two-part test, which requires the retailer to show (1) that the area for on-premises consumption is physically separated or otherwise distinguishable from the area where food not for immediate consumption is sold; and (2) that the retailer has a separate means of recording and accounting for collection of receipts from sales of both high and low rate foods. *See* 86 Ill. Admin. Code, § 130.310(b)(1)(A) and (B); *see also id.*, § 130.310(d)(1) and (d)(2) ("Test to Determine Applicable Rate").

The Court agrees that the regulation suggests that the Store is not entitled to charge the low tax rate on sales of bulk coffee grounds because the area for on-premises consumption of food purchased at the store is not physically separated or otherwise distinguishable from the area where the coffee beans are sold. The regulation contains a "decision tree" or flow chart, titled "Test to Determine Tax Rate for Food Items Sold by a Retailer (excluding Restaurants and Cafeterias)," which illustrates how the two-part test is supposed to work. The first question on

the flow chart asks whether the retailer has on-premises seating. There is no dispute that the Store has on-premises seating, so the answer of "yes" leads to the second question, which asks whether the area for on-premises consumption is physically separated from the area where food not for immediate consumption is sold. When the answer to that question is "no," the flow chart states that "all items sold in the store are subject to tax at the high rate, even food not prepared for immediate consumption."

Plaintiff attempts to avoid this result with two arguments. First, Plaintiff asserts that the question of whether the area of the Store for on-premises consumption is physically separated from the area where food not for immediate consumption is sold is a factual one on which he needs discovery. The Court is skeptical of that argument, as Plaintiff allegedly was in the Store when he purchased the coffee beans and therefore has personally seen its physical layout. Discovery on that issue, therefore, is unnecessary. Moreover, the fact that Dunkin' Donuts stores in general do not have an area for on-premises consumption that is physically separated or otherwise distinguishable from the area where food not for immediate consumption is sold is one that the Court believes it could take judicial notice of.

Second, Plaintiff argues that the two-part test is not applicable here because that general test does not deal specifically with coffee shops. Plaintiff points to a different part of the regulation, which sets forth examples to use as guidelines for

when to apply the high and low tax rates, one of which is said to apply to "Coffee Shops" and states as follows:

> Provided that the requirements of either subsection (d)(1) or (d)(2) are met, coffee, latte, cappuccino and tea . . . and food sold for consumption on the premises (e.g., pastries, cookies, snacks) are subject to the high rate of tax. Bulk coffees (beans or grounds, for instance), and teas, or pastries that are not consumed on the premises, are subject to the low rate of tax.

86 Ill. Admin. Code § 130.310(d)(4)(I). Plaintiff relies on the last sentence of this example, which he argues unequivocally states that bulk coffees that are not consumed on the premises are subject to the low tax rate. The Store, on the other hand, argues that this last sentence must be read in conjunction with the first sentence, which begins with the language "[p]rovided that the requirements of either subsection (d)(1) or (d)(2) are met." According to the Store, this language qualifies the stand-alone sentence at the end of the coffee shop example by importing the two-part test (found in subsection (d)(1) or (d)(2) of § 130.310)), pursuant to which sales do not qualify for the low tax rate if the retailer does not maintain an area for on-premises consumption that is physically separated or otherwise distinguishable from the area where food not for immediate consumption is sold. To interpret the example otherwise, the Store contends, would be inconsistent with the flow-chart and earlier provisions of the regulation setting forth the two-part test.

The parties engage in a spirited debate over how to interpret the introductory clause to the coffee shop example above, and, specifically, whether that example should be interpreted according to its plain language versus in a manner that

avoids inconsistency with other parts of the regulation. Their debate, however, only serves to prove that the regulatory language is confusing. A definitive opinion from the Illinois Department of Revenue clearing up this confusion by explaining what tax rate would apply to this fairly straightforward set of facts would have been helpful. Nonetheless, no such opinion exists. The only opinion that the parties have provided in aid of the Court's interpretation of the statute is a published private tax letter dated December 21, 2012 concerning the sale of gift baskets.[12] The gift baskets contained among other things coffee beans, and the party requesting the private letter ruling asked what tax rate should apply to the coffee. The private tax letter states:

> Assuming that over 50% of your food sales are not food prepared by you for immediate consumption, and that you have no on-premises dining facilities, we believe the prepackaged coffee . . . [is] taxable at the low rate of tax (1% plus any applicable local taxes).

A reasonable reading of this private letter ruling is that, if there were on-premises dining facilities—such as those the Store has—the high rate of tax applies to sales of pre-packaged coffee.

In any event, the Court is not required to resolve the tax issue of whether the low rate or the high rate applies to the Store's sale of coffee beans. Even if all disputed facts relevant to that issue were resolved in Plaintiff's favor and even if Plaintiff's interpretation of the regulation prevailed, the issue before the Court is

---

[12] Available at http://tax.illinois.gov/LegalInformation/LetterRulings/st/2012/ST-12-0063.pdf

whether Plaintiff has adequately alleged a legally sufficient claim for a deceptive or unfair trade practice. And the Court concludes that he has not for several reasons.

In the first place, the Store's conduct of collecting sales taxes at the higher rate does not appear to the Court to be either deceptive, *see Tudor v. Jewel Food Stores, Inc.,* 681 N.E.2d 6, 8 (Ill. App. 1st Dist. 1997) (no deception, where, among other things, the plaintiff pled that "the defendant provided her with a receipt enabling her to determine whether the scanned prices accurately reflected the advertised and shelf prices"), or unfair, *id.* (no unfairness where the plaintiff had "not adequately pleaded that she had no alternative but to pay the incorrectly scanned prices"). Plaintiff cites to *Stianos*, which held that the overcharging of sales tax constitutes a practice that is both deceptive and unfair. But that case is distinguishable because it involved an enforcement action brought by the state attorney general's office to enjoin the defendant from collecting excessive sales tax on nonprescription drugs. In addition, there was no ambiguity under the tax statute or regulations regarding the amount of sales tax that the defendant was supposed to be collecting from consumers in that case. Here, as discussed, there most certainly is. And even if the Store's interpretation of the regulations is incorrect, the Court cannot say that it is unreasonable. Indeed, based on the flow chart and the private letter ruling, the Court believes the Store's interpretation is more persuasive than Plaintiff's interpretation.

Additionally, Plaintiff has not alleged the second element of reliance under the ICFA.[13] In this regard, the Court finds the Illinois Appellate Court's recent opinion in *Karpowicz,* 2016 WL 3609106 (*supra,* n.1) instructive.[14] The plaintiff in *Karpowicz* appealed from the state circuit court's dismissal with prejudice of his amended putative class action complaint against the defendants, Papa Murphy's International and P-Cubed Enterprises. The former is the franchisor of pizza stores which sell "take-and-bake" uncooked pizzas that the consumer takes to bake at home, and the latter is one of the former's franchisees. The complaint alleged that the consumer should only be charged 1% sales tax on defendants' pizza because the franchisee's store did not have facilities for on-premises consumption of food and the pizzas were not ready for immediate consumption. *Id.* at *1. The court held that the complaint failed to state a claim for deceptive or unfair trade practices because

> the plaintiff did not plead any facts that would demonstrate intent by either defendant for him to rely on a purported deception; the plaintiff states that the defendants have a "routine practice" of overcharging tax and the charge "was intended to cause the Plaintiff to rely on the guise that the sales tax was lawful." However, the plaintiff offers nothing more than the tax charge he paid in July 2014. These are not factual pleadings that can meet the elements of a cause of action.

---

[13] While intent to deceive is not a required element of a claim under ICFA, the statute does require proof that the defendant intended the plaintiff to rely on the defendant's act or conduct that the plaintiff claims was deceptive or unfair. *See, e.g., Hoke v. Beck,* 587 N.E.2d 4, 8 (Ill. App. 1992).

[14] *Karpowicz* was decided after the briefing in this case, but before the oral argument was held. None of the parties, however, called the Court's attention to the case, despite the similarity between the issues addressed by the Illinois appellate court there and the issues here.

*Id.* at \*4 (citing *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill.2d 497, 520 (1989) ("an actionable wrong cannot be made out merely by characterizing acts as having been wrongfully done; the pleading of conclusions alone will not suffice for the factual allegations upon which a cause of action must be based")). Similarly, in this case, the allegation of overcharging on sales tax is insufficient by itself to allege a claim under the ICFA. Like the complaint before the court in *Karpowicz*, the complaint here does not allege any facts that would render plausible the contention that the Store intended Plaintiff to rely on its purported representation that the sale tax it charged at the higher rate was lawful.

The other two holdings of the *Karpowicz* court also would seem to apply here, although they do not relate to the elements of a claim under the ICFA and Defendants have not raised either issue as a basis for dismissal of the complaint. First, the court noted that, under well established Illinois law, a plaintiff "may not assert a claim to recover taxes that have been remitted to the state, even if such payment was erroneous." *Karpowicz,* 2016 WL 3609106, at \*2. The court observed that the plaintiff in that case had not alleged "either that the defendants retained the tax rather than remitting it to the state, or that the defendants recovered the tax through a refund, which appears to be the only basis for seeking [ ] restitution (of the taxes) from the retailer." *Id.* Therefore, the court held, the complaint was subject to dismissal. Here, there is no evidence in the record regarding whether the taxes collected by the Store were remitted in full to the state. Nor does the complaint contain any allegations in this regard. *Karpowicz* suggests, however, that

it is the plaintiff's burden *to allege* that funds collected were not remitted to the state, and that the plaintiff's failure to do so constitutes grounds for dismissal of a complaint seeking to recover the allegedly excessive taxes. The *Karpowicz* court went on to expressly reject the argument (which Plaintiff also makes here) that, even if Defendants did remit the collected taxes in full to the state, that would not be a defense to the plaintiff's action to recover the taxes. The court held that the language from *Stianos* cited by the plaintiff as allegedly standing for the contrary proposition[15] was limited by the fact that *Stianos* involved an enforcement action by the state and did not apply in a suit by a taxpayer to recover taxes already remitted to the state. *Karpowicz*, 2016 WL 3609106, at *2 n.4.

Second, the *Karpowicz* court held that, "[e]ven if the plaintiff could demonstrate that his case can be maintained against a retailer after the taxes have been remitted to the state, . . . the voluntary payment doctrine bars his claim." *Id.* at *3. As the court explained, "[t]he proper procedure for establishing involuntary payment of taxes to the state is set out in the Protest Fund Act, which provides that a consumer who wishes to contest a collection of the use tax can do so by paying under protest and then suing the retailer, the Director of the Department of Revenue, and the Illinois Treasurer to require that the corresponding retailers' occupation tax be paid under protest into a protest fund." *Id.* The court noted that

---

[15] The plaintiff in *Karpowicz* cited to the same language on which Plaintiff relies for this argument. *See* R. 39 at 15 n.3 (quoting *Stianos*, 475 N.E.2d at 1029 ("It is also unfair to permit the extraction from the consumer of excessive sums under the guise it is a lawful tax. If, as defendants alleged in their answer, the excess sums collected were turned over to the State, defendants' conduct remains unfair and deceptive to the consumer's injury."))

there were two exceptions to the rule against recovery when a plaintiff fails to follow the procedure outlined in the Protest Fund Act—(1) the taxpayer lacked knowledge of the facts upon which to protest the taxes at the time he or she paid the taxes, or (2) the taxpayer paid the taxes under duress. *Id.* at *3. But the court held that neither exception applied in that case. *Id.* Again, it appears that a similar argument could be made here regarding Plaintiff's inability to satisfy the two exceptions to the Protest Fund Act procedure. But, because Defendants have not raised the argument, the Court will not decide this case on that basis.

Beyond citing to *Stianos*, Plaintiff gives two additional reasons why he has alleged an adequate claim under the ICFA. First, he points out that Starbucks and other competitors of the Store use a 1% tax rate. But that fact, even if true, would not alter the Court's analysis. Essentially, what the Store did here was follow a conservative interpretation of the statute and regulations, and charge the higher tax amount. It is altogether logical that they would do this. If the Store charged the 1% rate, and the IDOR then audited it and determined that the higher rate should have been used, the Store would be liable for paying those taxes. As a practical matter, the Store would have no recourse against its customers who already paid for the bulk coffee and long since left the premises. The Store's decision to collect the higher tax is based on an altogether reasonable interpretation of the statute and implementing regulations, and constitutes a conservative business practice (assuming, of course, that the Store in fact remitted the higher tax amount to the State, an assumption that Plaintiff has not rebutted in the complaint, presumably

because he has no good faith basis to do so). The Store followed this practice despite the economic disadvantage it suffers by having to charge customers a higher gross price for its bulk coffee sales than its competitors. In other words, unless there was an allegation that the Store was illegally retaining the collected taxes rather than remitting in full to the state, it makes absolutely no sense for the Store to charge a higher rate than it legitimately thinks it is required to charge because it is not in its economic interest to do so. It simply is not fraud or an unfair business practice for the Store to follow this conservative practice, even if the Store's interpretation of the regulation is incorrect and the lower 1% tax could have been imposed. *See Stern v. Norwest Mortg., Inc.,* 688 N.E.2d 99, 104 (Ill. 1997) ("Defendant . . . merely made an honest mistake concerning the interpretation of a statute that had yet to be construed. While we have found that defendant's action of charging an escrow waiver fee was prohibited under the Escrow Act, we do not believe that the defendant's actions in this case violated the Fraud Act."); *Lee v. Nationwide Cassel, L.P.,* 675 N.E.2d 599, 604 (Ill. 1996) ("Defendant's alleged misrepresentation . . . was based upon an erroneous interpretation of [the statute]" and an "uncertainty about the applicable law" cannot form the basis for claim of deception, fraud, or misrepresentation); *Cahnman v. Agency Rent-A-Car Sys., Inc.*, 701 N.E.2d 512, 516 (Ill. App. 1st Dist. 1998) ("The language of [the statute] does not explicitly prohibit defendant's conduct. At best, it was arguably ambiguous . . . . The situation here . . .

is one where the parties hold reasonable differences of opinion on the interpretation of a statute and legitimately disagree as to what [the statute] permits.").[16]

Finally, the Court also rejects Plaintiff's contention that, even if Defendant's interpretation of the IDOR regulation at issue is correct, Defendants were unreasonable in relying on the regulation because it is contrary to the plain and unambiguous language of the statute. While it is true that "agency rules enacted pursuant to a taxing statute may not be used to broaden the tax imposition authorized by the statute," *Oak Liquors, Inc. v. Zagel*, 413 N.E.2d 56, 59 (Ill. App. 1980), the issue of whether the IDOR exceeded its authority when it issued the regulation is not before the Court. Unless and until it is authoritatively decided that the IDOR exceeded its authority when it issued the regulation, the Store must assume that the regulation is the law. *See Union Elec. Co. v. Dept of Revenue,* 556 N.E.2d 236, 239 (Ill. 1990) ("The Department has promulgated regulations to assist it in applying the ROTA and Use Tax Act . . . . These regulations have the force and effect of law, and must be construed under the same standards which govern the construction of statutes."). Although neither party has mentioned § 10b(1) of the ICFA, that provision specifically grants immunity from liability in this situation:

> Nothing in this Act shall apply to . . . [a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State.

---

[16] At the oral argument, Plaintiff objected to the argument that a reasonable difference of opinion regarding the meaning of a statute does not give rise to a deceptive or unfair trade practice claim on the ground that Defendants did not raise it until their reply brief. The Court offered to allow Plaintiff to file a surreply brief addressing the argument, but Plaintiff declined.

815 ICSA 505/10b). In 2005, the Illinois Supreme Court applied Section 10b(1) in rejecting a claim of unfair or deceptive trade practices, stating as follows:

> Although the Consumer Fraud Act is to be liberally construed . . ., the legislature clearly intended for certain actions or transactions . . . to be exempt from liability under the . . . Act, without regard to the possible merits of the asserted claim. Section 10b(1) reflects a legislative policy of deference to the authority granted by Congress or the General Assembly to federal and state regulatory agencies and *a recognition of the need for regulated actors to be able to rely on the directions received from such agencies without risk that such reliance may expose them to tort liability*. Further, section 10b(1), by exempting certain conduct from liability even if the conduct itself is objectionable, serves to channel objections to agency policy and practice into the political process rather than into the courts. Parties who desire to bring about change in agency policies or rules can take their complaints to the agency itself and can participate in the formal rulemaking process. If their concerns are not addressed by the agency, they may seek assistance from their legislators and may use the political process, including the power of the ballot box, if their voices are not heard.

*Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 38-39 (Ill. 2005) (emphasis added). In short, the Store was entitled to rely on its reasonable interpretation of the IDOR regulation, and therefore cannot be held liable under the consumer fraud statute even if, as Plaintiff argues, the regulation incorrectly implements the statute.

## 2. NEGLIGENT MISREPRESENTATION

In addition to his claim under the consumer fraud act, Plaintiff also alleges a claim for negligent misrepresentation. That claim too must be dismissed. To state a claim for negligent misrepresentation under Illinois law, a party must allege: (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the

truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information. *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 334-35 (Ill. 2006).

Just as Plaintiff cannot establish the intent to induce reliance element of his ICFA claim, he also cannot establish that element of his negligent misrepresentation claim. In addition, Plaintiff cannot establish the duty element of a negligent misrepresentation claim. The duty in this case is a contractual one, and, under the *Moorman* doctrine, recovery in tort is barred for purely economic losses arising out of a failure to perform contractual obligations. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 448-49 (Ill. 1982). There are a number of exceptions to the *Moorman* doctrine, each rooted in the general rule that "[w]here a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 567-68 (7th Cir. 2012). Plaintiff tries to fit within one of these exceptions by making an argument that the imposition of taxes is extra-contractual. But the Court does not believe Plaintiff's interpretation of the allegations is reasonable, because the taxes are imposed at the same time as the sale itself and are part of the overall sales transaction. Plaintiff is charged under a single bill, not two separate bills (one for tax and one for the product itself). To the extent that the Store owed Plaintiff a duty to charge the correct amount of taxes, that duty arose from the sales

transaction, in other words, it emerged solely out of the Store's contractual obligation to Plaintiff.[17]

Plaintiff also asserts that the Store has a statutory duty to charge Plaintiff the correct amount of tax. A separate statutory duty would be sufficient to take the case out of the *Moorman* doctrine. *See, e.g., Selective Ins. Co. of The Se. v. Homeworks Cent. Inc.,* 2013 WL 1286982, at *6 (C.D. Ill. Mar. 26, 2013). But Plaintiff fails to explain how the ROTA and UTA establish a duty on the part of the retailer that is owed *to the consumer* to collect the correct sales tax amount. The ROTA provides only that the retailer owes a duty to the state to collect and remit to the state the retailers' occupation tax. And, the UTA imposes a duty not on the retailer but on the consumer to pay the use tax amount.

Finally, Plaintiff suggested during oral argument that perhaps a contract claim still survives. Of course no breach of contract is alleged in this case. But even if Plaintiff were to amend his complaint to allege a breach of contract, all that would do is put off for another day the decision of whether the high tax rate or the low tax rate should apply. Although not necessary to decide the merits of this decision, the Court has concluded that the arguments in favor of the high tax rate are more compelling, and therefore an amendment to add a breach of contract claim would be futile.

## CONCLUSION

---

[17] As Defendants put it, "sales tax is a legally-mandated element of sales transactions" and thus the sales tax paid by a consumer "arise[s] directly out of the sales transaction." R. 44 at 15.

For the reasons discussed above, Defendants' motions to dismiss, R. 22 and R. 32, are granted, and Plaintiff's claims against both Defendants are dismissed without prejudice. If Plaintiff intends to seek leave to file an amended complaint, he should file a motion for leave to amend and brief in support of no more than five pages explaining why an amended complaint would cure the defects in the original complaint identified in this order, with a copy of the proposed amended complaint attached as an exhibit. The motion for leave to amend and brief, or else a motion for an extension of time, must be filed within fourteen days of the date on which this memorandum opinion and order is entered. Defendants may file a response to Plaintiff's brief, also limited to no more than five pages in length, and shall do so on or before seven days after Plaintiff files the proposed amended complaint. No reply brief is to be filed without prior leave of court. If Plaintiff does not file a motion for leave to amend, or else a motion for an extension of time, within fourteen days, Plaintiff's claims against Defendants will be dismissed with prejudice.

ENTERED:

_Thomas M Durkin_

Thomas M. Durkin
United States District Judge

Dated: December 6, 2016